UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW KOSTRZEWSKI,<br>    Plaintiff, | )<br>)<br>) No. 1:20-cv-682 |
| -v- | )<br>) Honorable Paul L. Maloney |
| CITY OF WYOMING, et al.,<br>    Defendants. | )<br>)<br>)<br>) |

## OPINION

This matter is before the Court on Defendants' motion for judgment on the pleadings (ECF No. 15) and Plaintiff's motion to amend the complaint (ECF No. 22). For the reasons to be explained, the Court will grant the motion for judgment on the pleadings in part, deny it in part, and grant the motion to amend.

### I.

The following facts are taken from the complaint, and the Court accepts them as true. On August 2, 2018, decedent Jonathan Kostrzewski was drunk, depressed, and angry at the apartment he shared with his girlfriend, Shaianna Donley, and two roommates, Paige Corp and Jason Heksem. Jonathan[1] was so upset that Corp and Heksem contacted Donley and asked her to come home. Donley and Jonathan argued and when Jonathan's behavior escalated, Donley informed him he would have to sleep on the couch. Jonathan began throwing glass plates and dishes, and he broke a large glass table. He threw a broken glass at Donley's head. Donley believed that she or her roommates might be injured, or that

---

[1] Several members of Jonathan's family are involved in the fact pattern and they share a surname, so the Court refers to them by their first names in this opinion.

Jonathan might injure himself because he would often threaten suicide when he was drunk and/or depressed. Donley also believed Jonathan to be abusing Xanax. At 11:21 p.m., Donley called 911. The 911 "call type" was recorded as "SUICIDETH."

Jonathan became even more angry after Donley called 911. He grabbed his fishing pole and some bags and left the apartment on foot. Shortly thereafter, several City of Wyoming police officers appeared on scene, responding to the 911 call: Officers Jacob Blysma, Erich Staman, Aaron Brooks, and Jake Terpstra. Donley only recalls speaking to two male officers, whom she had to convince to look at the destruction in the apartment. Donley informed the officers that Jonathan had a history of depression, anxiety, and suicidal ideation. She reported that he was bleeding from the broken glass and told the officers that she believed he would be heading to a familiar fishing spot nearby where he would often go when upset. The officers said they would look for him and told Donley to call them back if he reappeared and acted belligerent.

The officers located Jonathan on a bridge nearby. Jonathan was obviously drunk, and he reported being sad and depressed about arguing with Donley. Officer Blysma appears to have spoken to Jonathan: Jonathan denied ever wanting to hurt himself in the past and denied wanting to hurt himself at the time. Officer Blysma also reported that a third-party EMS service, AMR, was called to the scene, and that AMR personnel evaluated Jonathan and offered to take him to the hospital. Jonathan refused to go to the hospital, and the AMR employee(s) did not require him to go to the hospital, so the police officers decided to take Jonathan back to the apartment so he could go to sleep.

While the officers were speaking to Jonathan on the bridge, he was on the phone with his mother, Lori Kostrzewski. Lori confirms that he was clearly depressed, upset, and drunk. She heard the officers make a plan to take Jonathan back to his apartment, but she also heard Jonathan ask to be taken to jail at least twice, because Donley would not let him back into the apartment.

The officers did take Jonathan back to the apartment: Donley watched as Jonathan was dropped off near the apartment's front door around 12:25 a.m. Still drunk and still agitated, Jonathan called Donley on his cell phone and buzzed the apartment's buzzer, asking to be let in. Donley threw Jonathan's work bag down the stairs but did not speak to him. Corp spoke to Jonathan and informed him he could not stay in the apartment that night. The women gave Jonathan some clothes and a blanket but refused to let him in the apartment.

Lori called 911 at 12:54 a.m., and the dispatcher transferred her call to the Wyoming Police Department at 1:03 a.m. Lori reported that Jonathan had called her, that he was unstable, and that he was planning to kill himself. Lori reported that Jonathan had said he loved her, he was done, and bye. In response to Lori's 911 call, Wyoming Police returned to the apartment and AMR was called to the scene a second time. AMR personnel were on site at 1:05 a.m. and appear to have remained there until approximately 1:36 a.m., but neither the police officers nor AMR staff could locate Jonathan, so AMR left.

Donley recalls it being around 1:13 a.m. when she spoke with five police officers. Donley again informed the officers that Jonathan would often threaten suicide when he was drunk and upset, and that Jonathan was not in this apartment or in Lori's home. Donley

3

offered to let the officers search her apartment, but they declined. Donley told the officers of a few spots nearby that Jonathan would sometimes go and sleep in his hammock when he was drunk and angry.

An unnamed Wyoming Police Officer called Lori back at 1:24 a.m., checking the validity of her claim and telling her that Jonathan was acting fine after their first encounter with him.

Around 1:41 a.m., a Wyoming Police Officer called Donley and asked if she had a car that Jonathan had access to, whether he could drive it, and if she had her keys. She told them she did have a car, Jonathan could not access it, and that she had her keys. She could see the car from her apartment window. At approximately 2:10 a.m., an officer called Donley and told her that Jonathan was not at the car. The officer asked for Jonathan's cell phone number so they could "ping" his cell phone. At about 2:31 a.m., the officers told Donley that Jonathan's phone appeared to be in the building; Donley told them that could not be true. The officers left out the back of the building, and Donley asked them if they had checked in the woods by a nearby dog park because Jonathan had gone there before. The officers responded that they expected Jonathan to be within a 100–200-foot radius from the ping.

At 2:45 a.m., Officer Blysma reported finding Jonathan's body 300 feet behind the leasing office, hanging from a tree with a nylon hammock strap around his neck. AMR was called a third time, and CPR was applied without success. Jonathan was pronounced dead on scene at 3:22 a.m. The officers contacted Lori and Jonathan's father, Matthew Kostrzewski, and they returned to the apartment to inform Donley around 4:54 a.m. An autopsy confirmed that Jonathan's cause of death as asphyxia by hanging.

After Jonathan died, his parents contacted AMR to learn more about what happened on the night of August 2. A few days after the death, an unnamed AMR representative told Matthew that AMR did not have any contact with Jonathan until he was found in cardiac arrest. On August 16, 2018, an AMR supervisor told Matthew that AMR's first report to the scene (shortly after midnight) was cancelled by the police officers. AMR reported on the scene at 12:06 a.m. but was called off at 12:11 a.m. The next day, a different AMR employee, Tim,[2] told Matthew that AMR had only responded to two calls. A few days later, Tim explained that it looked like AMR had received three calls but that the first call was canceled by the police.

On August 16, 2018, both parents spoke with Wyoming Detective Robinson,[3] who read parts of the police report to them. Detective Robinson said that based on the police report, AMR had appeared on scene, assessed Jonathan, and determined that he did not want or need to go to the hospital. The same day, Matthew called AMR again, and an AMR employee, Scott,[4] confirmed that no AMR employee spoke with Jonathan or had contact with him before his suicide attempt. Scott encouraged Matthew to contact the City of Wyoming to discover why the police report stated that someone from AMR had assessed Jonathan.

On August 21, 2018, Lori and Matthew met with Detectives Maloney[5] and Robinson and questioned them about the police report. The detectives stood by the police report.

---

[2] Tim's last name is not contained in the complaint.
[3] Detective Robinson's first name is not contained in the complaint.
[4] Scott's last name is not contained in the complaint.
[5] Again, Detective Maloney's first name is not contained in the complaint.

After this meeting, Matthew called AMR and Tim again confirmed the second and third calls: the stand-by call that was called off when no one could locate Jonathan, and the third call in response to the suicide.

On October 1, 2018, Plaintiff's counsel made a Freedom of Information Act[6] request to the City of Wyoming. The City responded to that request on October 18, 2018. The City's response included an email dated October 7, 2018, written by Amanda Quist to Wyoming Police Officer Dustin Vandermeer, and signed by Amanda Stewart. It is not clear who the two Amandas are, or if they are the same person. The email alleged that an AMR employee did assess Jonathan the night of his death.

On July 24, 2020, Matthew filed this lawsuit as personal representative of Jonathan's estate against the City of Wyoming and Wyoming Police Officers Brandon Knowling, Jacob Blysma, Erich Staman, Aaron Brooks, Jake Terpstra, and Devin Quintard. The lawsuit initially brought three claims: I) a § 1983 claim against all Defendants for state-created danger; II) A *Monell*[7] claim against the City of Wyoming for failure to train; and III) a Michigan gross negligence claim against all Defendants. The parties have since stipulated to the dismissal of Count III.

Defendants filed a motion for judgment on the pleadings (ECF No. 15). After that motion was fully briefed, Plaintiff filed a motion to amend the complaint (ECF No. 22). Plaintiff explains that he filed a case in state court against AMR and Amanda Stewart, and he

---

[6] 5 U.S.C. § 552 *et seq.*
[7] *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

now wishes to "join" the two cases by adding the state law malpractice claims against AMR and Stewart to this case. The Court heard oral argument on both motions on April 29, 2020.

## II.

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." The standard of review for a motion for judgment on the pleadings under Rule 12(c) is the same as that of a motion under Rule 12(b)(6), a motion for failure to state a claim upon which relief can be granted. *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008).

A complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A defendant bringing a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide sufficient factual allegations that, if accepted as true, are sufficient to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, and the "claim to relief must be plausible on its face." *Id.* at 570. "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365,

369 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). If plaintiffs do not "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When considering a motion to dismiss, a court must accept as true all factual allegations, but need not accept any legal conclusions. *Ctr. For Bio-Ethical Reform*, 648 F.3d at 369. The Sixth Circuit has noted that courts "may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050 (6th Cir. 2011). However, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"; rather, "it must assert sufficient facts to prove the defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Rhodes v. R&L Carriers, Inc.*, 491 F. App'x 579, 582 (6th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).

### III.

#### A. Count I: State Created Danger

Count I brings a § 1983 claim against all Defendants. To successfully plead such a claim, Plaintiff must plead facts that show the deprivation of a constitutional right caused by someone acting under color of state law. *McQueen v. Beecher Community Schools*, 433 F.3d 460, 463 (6th Cir. 2006).

Defendants' first argument in favor of dismissing the complaint is that Plaintiff has failed to allege specific facts demonstrating how each defendant officer acted to violate

8

Jonathan's constitutional rights. It is true that a plaintiff must eventually demonstrate that each government-official defendant, through that official's own individual actions, has violated the constitution. *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014). However, Defendants have only cited cases decided at the summary judgment stage. *See id.; Heyerman v. County of Calhoun*, 680 F.3d 642 (6th Cir. 2012); *Wilson v. Morgan*, 477 F.3d 326 (6th Cir. 2007). At this stage, the Court must accept all of the complaint's allegations as true and draw all reasonable inferences in plaintiff's favor. And the Sixth Circuit has made clear that "granting qualified immunity at the motion to dismiss stage is usually disfavored." *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). The Circuit "generally denies qualified immunity at the motion to dismiss stage in order for the case to proceed to discovery, so long as the plaintiff states a plausible claim for relief." *Id.* at 606. Taking these two points together, the Court will not dismiss the complaint simply because it brings few allegations against specific officers and more allegations against "Defendants" as a group.

### 1. State-Created Danger Theory

Turning to the merits of Count I: Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process clause." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). However, a "state-created danger" exception exists. In order to succeed on a state-created danger claim, Plaintiff must plead:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large;

and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003).

### a. Affirmative Act

To satisfy the affirmative-act element of a state-created danger claim, Plaintiff must point to "conduct which either created or increased the risk of harm, and show not only that he could have been saved, but also that he was 'safer *before* the state action than he was *after* it.' " *Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017) (quoting *Cartwright*, 336 F.3d at 493).

Plaintiff focuses on one affirmative act: the officers' decision to take Jonathan back to his apartment, even though he would not be allowed to sleep there because he had just assaulted his girlfriend inside the apartment. Defendants argue that this was simply returning Jonathan to the status quo ante, which is insufficient: the government cannot be liable if it merely returns a person to a situation with preexisting danger. *Jones*, 438 F.3d at 693. But a charitable reading of the complaint—which the Court is required to perform at this stage—gives rise to the inference that the officers' decision to return Jonathan to the apartment did increase his danger. Returning him to the apartment made him more agitated because his roommates barred him from entering the apartment. When he became more agitated, his suicidal ideations increased, in turn placing him at higher risk of harm *after* the state's actions.

A second (in the Court's opinion, stronger) affirmative action is the officers' decision to call off AMR shortly after midnight. The complaint outlines a question of fact on this issue: it is not clear whether AMR was called and then called off, never called, or called and

10

assessed Jonathan. Taking the facts in the light most favorable to Plaintiff here, the Court assumes that the officers called AMR, determined themselves that Jonathan was fine, and called off AMR. Taking this fact pattern together with the assertion that Lori heard Jonathan ask the officers to take him to jail, the Court finds that the officers' decision to call off emergency medical help could qualify as an affirmative action that placed Jonathan in more danger. Jonathan was clearly drunk, agitated, and depressed: The officers heard him ask to go to jail and possibly heard him tell his mother that he was "done, that he loved her, and bye." Donley had informed the officers that Jonathan had a history of suicidal ideations both when he was drunk and after they had fought. The officers must have judged that he was in some sort of distress to call AMR, and, based upon the instant record, there do not appear to have been mitigating factors between summoning AMR and calling them off. If anything, Jonathan became more agitated after the officers decided he should return to the apartment. Thus, by calling off AMR, the officers took an affirmative action *not* to have Jonathan evaluated by mental health professionals, and that may have placed him at a higher risk of harm. Therefore, the complaint contains sufficient facts to satisfy the first element of the state-created danger test.

### b. Special Danger

The parties do not address this factor in any depth in their pleadings, so the Court's analysis is short as well. Jonathan was palpably at an individual risk of danger to himself, rather than at a risk of danger that affects the public at large. The complaint contains sufficient facts to satisfy the second element of the state-created danger test.

### c. Mental State

The mental state required to satisfy the third element of the state-created danger test is deliberate indifference, which the Circuit has "equated . . . with subjective recklessness." *McQueen*, 433 F.3d at 469. To show subjective recklessness, the state official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.* "The government's conduct must be so egregious that it can be said to be arbitrary in the constitutional sense, but the standard is no calibrated yard stick." *Id.* (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)) (internal quotation marks omitted). Subjective recklessness can be "proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it." *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003).

Again, at this stage, the Court must read the complaint in the light most favorable to Plaintiff. A charitable reading of the complaint shows that Jonathan was obviously distressed. The officers knew about his history of suicidal ideations when drunk, and they could observe that he was drunk. The officers were aware he had just engaged in a violent fight with Donley, and at some point, they believed he was at a high enough risk to call AMR for an evaluation. It is possible that they heard him say goodbye to Lori, which is striking in the context of Jonathan's history of suicidal ideations. At this point, it is plausible that the risk to Jonathan was so obvious that the officers knew about it. Therefore, the complaint pleads sufficient facts to satisfy the third prong of the state-created danger test. And with that, Plaintiff has adequately pleaded a cause of action, which would ordinarily end the Rule 12(c) analysis. However, Defendants argue that they are entitled to qualified immunity.

### 2. Qualified Immunity

"[G]overnment officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a "defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009). But as noted above, the Sixth Circuit disfavors granting qualified immunity at the motion to dismiss stage. *Marvaso*, 971 F.3d at 605.

The question of Defendants' qualified immunity is a two-pronged inquiry. First, the Court "must decide whether the facts that the plaintiff has alleged or shown make up a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations omitted). As explained above, this prong has been satisfied.

Second, the Court "must decide whether the right at issue was clearly established at the time of the defendant's misconduct." *Id.* (internal quotation marks and citation omitted). For a right to be clearly established, the existing case law precedent must demonstrate that the existence of the right is beyond dispute, such that every reasonable officer would have understood that what he is doing violates that right. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). There need not be caselaw that considers the exact same factual scenario at issue. *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005). But the law "must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-minded, reasonable government agent that what defendant is doing violates federal

13

law in the circumstances." *Gragg v. Kentucky Cabinet for Workforce Development*, 289 F.3d 958, 964 (6th Cir. 2002) (internal quotation marks and citation omitted). Qualified immunity will shield an officer for liability for mistakes of law, mistakes of fact, or mistakes based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231.

The Court recognizes that the Sixth Circuit has twice stated that the state-created danger theory is generally inapplicable to suicide cases. *Jahn v. Farnsworth*, 617 F. App'x 453, 463 (6th Cir. 2015); *Cutlip v. City of Toledo*, 488 F. App'x 107, 116 (6th Cir. 2012). However, the Circuit has never stated that the state-created danger theory can *never* apply in a suicide case: Both *Cutlip* and *Jahn* were decided at the summary judgment stage, with the benefit of discovery and a full evaluation of the relevant facts. Thus, the Court reads this line of caselaw to leave open the possibility that the state-created danger doctrine may apply in some cases of suicide, depending on how the facts develop. With this door left open, the Circuit's continued reminders that qualified immunity is generally best left for summary judgment, and at present, the particularly muddied facts of this case, the Court declines to grant Defendants qualified immunity at this early stage. Accordingly, the motion for judgment on the pleadings will be denied as to Count I.

### B. Count II: *Monell* Liability

Plaintiff's complaint also claims that the City of Wyoming is responsible for the officers' conduct. To raise such a claim, Plaintiff "must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. 658, 694 (1978)). Plaintiff can establish an illegal policy or custom by showing one of the following: "(1) the existence of an illegal official

14

policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

Plaintiff focuses on option three, a "failure-to-train" claim. To bring this claim, Plaintiff must plead (1) a clear and persistent pattern of illegal activity, (2) which the City knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the City's custom was the cause of the deprivation of Jonathan's constitutional rights. *Bickerstaff v. Lucarelli*, 830 F.3d 388, 402 (6th Cir. 2016). For this type of *Monell* claim, the municipal liability arises from the history of misconduct that created "notice that the training in this particular area was deficient and likely to cause injury." *Burgess*, 735 F.3d at 478. The Sixth Circuit has found that sufficient evidence of a clear and persistent pattern of illegal activity existed where at least 14 similar incidents had occurred, *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989), but that a county's knowledge of only three similar incidents could not establish notice of habitually unconstitutional conduct, *D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014). A broad assertion that an unconstitutional policy exists, without specific prior examples, "is nothing more than a bare recitation of legal standards" and is insufficient to state a claim. *Brown v. Cuyahoga County*, 517 F. App'x 431, 436 (6th Cir. 2013).

Unfortunately, a bare recitation of the legal standard is all that the complaint contains. Plaintiff recites the elements of a *Monell* failure-to-train claim but does not outline any similar

15

prior examples that could evidence a pattern of misconduct. Thus, Plaintiff cannot satisfy the first element of the *Monell* claim and Count II must be dismissed.

## IV.

After the motion for judgment on the pleadings was fully briefed, Plaintiff filed a motion to amend the complaint (ECF No. 22). Plaintiff seeks to join the pending state malpractice case against AMR and Amanda Stewart, the AMR employee who allegedly assessed Jonathan, with this case. Plaintiff seeks to amend the complaint to add these claims and defendants in the interest of judicial economy.

Leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). Defendants may be joined if "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(2)(B). "Joinder of parties is a matter highly dependent on judicial discretion." *Independent Liberty Life Insurance Co. v. Fiduciary & General Corp.*, 91 F.R.D. 535, 537 (W.D. Mich. 1981).

Based on the facts alleged in Plaintiff's complaint, the relationship between Defendants and the proposed AMR defendants will almost certainly have to be untangled for a full adjudication of this case. The AMR defendants are intimately involved in the fact pattern that gives rise to Count I, and the Court concludes that common questions of fact exist such that amendment is appropriate. Moreover, the interest of judicial economy is served by allowing Plaintiff to join the two lawsuits together, rather than proceed along parallel tracks that are investigating the same set of facts. Accordingly, the motion to amend will be granted.

## V.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's motion for judgment on the pleadings (ECF No. 15) is **GRANTED in part and DENIED in part.**

**IT IS FURTHER ORDERED** that Plaintiff's motion to amend (ECF No. 22) is **GRANTED.** An amended complaint shall be filed within 21 days of this order.

**IT IS SO ORDERED.**

Date: May 6, 2021                                                            /s/ Paul L. Maloney
                                                                                          Paul L. Maloney
                                                                                          United States District Judge